1
2
3
4
5
6                    UNITED STATES DISTRICT COURT

7                    EASTERN DISTRICT OF CALIFORNIA

8

9    THOMAS WILLIAMS,                          No. 2:20-cv-00598-TLN-CSK

10                  Plaintiff,

11        v.                                   **ORDER**

12   COUNTY OF SACRAMENTO, et al.,

13                  Defendants.

14

15

16        This matter is before the Court on Defendants City of Rancho Cordova ("City of Rancho

17   Cordova"), Nathan D. Daniel ("Daniel"), Derek Hutchins ("Hutchins"), and Joseph Zalec's

18   ("Zalec") (collectively, "City Defendants") Motion for Partial Summary Judgment.[1]  (ECF No.

19   64.)  Plaintiff Thomas Williams ("Plaintiff") filed an opposition.[2]  (ECF No. 69.)  City

20   Defendants filed a reply.  (ECF No. 72.)  For the reasons set forth below, the Court GRANTS in

21   part and DENIES in part City Defendant's motion for summary judgment.

22   ///

23

---

24   [1]     City Defendants are the only Defendants party to the instant motion for summary
25   judgment.  Defendant County of Sacramento ("County") filed a separate motion for summary
     judgment.  (ECF No. 65.)

26   [2]     Plaintiff's brother, Carlos Williams, filed a separate lawsuit against the County and City
27   Defendants ("Carlos Williams Action").  (No. 2:19-cv-02345-TLN-CSK.)  The Court
     consolidated the instant action with the Carlos Williams Action for discovery purposes only.
28   (ECF No. 23.)

### I.   FACTUAL AND PROCEDURAL BACKGROUND[3]

The instant action arises from an alleged unlawful search and seizure by police officers. The Court will first set forth the largely undisputed facts, and then turn to City Defendants' and Plaintiff's version of the events, both of which are disputed.

#### A.   Undisputed Facts[4]

Plaintiff and Carlos Williams are twin brothers and are Black.[5]   (PSUF ¶ 1.)  In 2019, Carlos Williams lived with his wife and daughter at 3590 Edington Way in Rancho Cordova, California (the "Subject Residence").[6]   (*Id.* at ¶ 2.)

On March 23, 2019, an individual named William Burnett ("Burnett") called the Sacramento County Sheriff's Office's emergency line to report a potential burglary in progress in his neighborhood.  (DSUF ¶ 6.)  Burnett called back a second time to provide updated information to the dispatcher.  (*Id.*)  At approximately 10:24 p.m., Deputies Daniel, Zalec, and Hutchins were dispatched to the Subject Residence to investigate the possible burglary in

---

[3]   The Court notes at the outset that City Defendants state the Rancho Cordova Police Department is a division of the Sacramento County Sheriff's Office.  This is a determination material to the County's motion for summary judgment.  (*See* ECF Nos. 65-1, 68, 71.)  City Defendants only note this in passing to assert that Sheriff's deputies assigned to Rancho Cordova follow the General Orders issued by the Sheriff's Office.  (*See* ECF No. 64-1 at 8.)  City Defendants also do not provide any evidence or authority to establish that the Rancho Cordova Police Department is indeed a division of the Sacramento County Sheriff's Office or that they share governing structures.  Accordingly, these statements do not change the analysis in the Court's consideration of the County's motion for summary judgment.

[4]   The following facts are undisputed unless otherwise noted and are taken largely verbatim from City Defendants' Statement of Undisputed Material Facts ("DSUF," ECF No. 64-2) and Pl.'s Statement of Additional Undisputed Facts ("PSUF," ECF No. 69-2).

[5]   City Defendants dispute this in terms of whether any Defendant was aware of their identity or relationship prior to the arrest.  (Defs.' Reply to Plaintiff's Statement of Additional Facts ("DR"), ECF No. 72-3 ¶ 1.)  However, City Defendants do not actually dispute any of these facts as presented.  The Court will therefore consider them undisputed for the purpose of this motion.

[6]   City Defendants dispute this in terms of whether any Defendant was aware of Plaintiff's identity, where he lived and who with prior to the arrest.  (Defs.' Reply to Plaintiff's Statement of Additional Facts ("DR"), ECF No. 72-3 ¶ 1.)  However, City Defendants do not actually dispute any of these facts as presented.  The Court will therefore consider them undisputed for the purpose of this motion.

2

1  progress.  (*Id.* at ¶ 7.)

2        Dispatch relayed the following information to Deputies Daniel, Zalec, and Hutchins:

3  Burnett did not know who lived at the Subject Residence.  (*Id.* at ¶ 8.)  He saw two unknown

4  subjects enter the Subject Residence through the side door of the garage.  (*Id.*)  The subjects were

5  using flashlights and played with the lock for a while before the door opened.  (*Id.*)  Burnett

6  confronted the subjects who initially stated they lived at the address.  (*Id.*)  The subjects then told

7  Burnett they did not live at the address and became verbally aggressive.  (*Id.*)  They told Burnett

8  to "mind his own business" and called him various names.  (*Id.*)  The subjects drove a grey

9  Dodge van and appeared to be in a hurry.  (*Id.*)  Dispatch later updated the call with new

10  information that the subjects were observed wearing masks.  (*Id.* at ¶ 9.)  One subject was

11  identified as a Black male adult, approximately six feet tall, 200 pounds, and wearing a white

12  jacket.  (*Id.*)  The last update from dispatch advised the deputies that the subjects were out of the

13  residence and walking toward Burnett's home on Evanston Way.[7]  (*Id.* at ¶ 10.)

14        At approximately 10:30 p.m., Deputies Daniel, Zalec, and Hutchins arrived on the scene

15  and parked their patrol cars on Edington Drive a couple of houses down from the Subject

16  Residence.  (*Id.* at ¶ 11.)  The subjects were standing in the street on Evanston Way.  (*Id.* at ¶ 17.)

17  One of the subjects was wearing a grey or white colored jacket closely resembling the clothing

18  described in the report to the police.  (*Id.*)  The parties dispute the facts surrounding the events

19  that occurred after the deputies arrived.

20        **B.**    <u>City Defendants' Disputed Facts</u>

21        According to City Defendants, Daniel identified himself as a police officer and told Carlos

22  Williams and Plaintiff to stop.  (*Id.* at ¶ 19.)  He gave this command for officer safety purposes,

23  ──────────────

24  [7]     Plaintiff objects to the inclusion of the facts set forth in this paragraph, contending that the statements are double hearsay.  (ECF No. 69-8 at 2.)  Plaintiff notes that Burnett purportedly

25  made the statements on a 911 phone call, which 911 purportedly repeated to Deputy Daniel.  (*Id.*)  City Defendants argue this evidence is being offered for a non-hearsay purpose — effect on the

26  listener.  (ECF No. 72-2 at 2.)  City Defendants note that the evidence explains what the deputies understood to be the facts and circumstances of the alleged burglary and shows why the deputies

27  took the actions they did.  (*Id.*)  The Court agrees with City Defendants.  Out-of-court statements introduced to show the effect on the listener are not hearsay.  *United States v. Payne*, 944 F.2d

28  1458, 1472 (9th Cir. 1991).  Accordingly, Plaintiff's objection is OVERRULED.

1    as deputies had not yet searched Plaintiff and did not know whether he was armed.  (*Id.*)  Plaintiff

2    immediately raised his voice and began yelling at deputies.  (*Id.* at ¶ 20.)  He continued to

3    advance toward deputies despite Daniel's command to him to stop.  (*Id.*)  Daniel drew his firearm

4    and pointed it at Plaintiff to gain Plaintiff's compliance.  (*Id.* at ¶ 21.)  Zalec, who also had his

5    gun drawn, then commanded Plaintiff no less than three times to turn around.  (*Id.* at ¶ 22.)  Zalec

6    gave this directive for officer safety purposes, again because deputies did not know whether

7    Plaintiff was armed.  (*Id.*)  Plaintiff did not turn around and continued yelling at deputies.  (*Id.* at

8    ¶ 23.)  Once they confirmed Plaintiff had no weapons in his hands, Daniel and Zalec holstered

9    their firearms and attempted to place Plaintiff in handcuffs.  (*Id.* at ¶ 24.)  A physical struggle

10   ensued.  (*Id.*)  Zalec and Daniel were able to place Plaintiff in handcuffs.  (*Id.* at ¶ 25.)  They

11   escorted Plaintiff to a patrol car where they conducted a pat search for weapons.  (*Id.*)  No other

12   search of Plaintiff's person was conducted.  (*Id.* at ¶ 26.)

### C.    Plaintiff's Disputed Facts

14          According to Plaintiff, while he and his brother were walking back to his brother's house,

15   three white individuals in dark clothing and baseball caps appeared out of the darkness with guns

16   pointed at close range at them.  (PSUF ¶ 8.)  Daniel, Hutchins, and Zalec approached Plaintiff and

17   his brother without sirens or police slights on.  (*Id.* at ¶ 9.)  The first words from Defendants were

18   from Daniel, who said, "show me your fucking hands."  (*Id.* at ¶ 10.)  Daniel, Hutchins, and Zalec

19   never identified themselves as police.  (*Id.* at ¶ 11.)  Carlos Williams told Daniel, Hutchins, and

20   Zalec twice, "you got a gun on me in front of my house?  I live here!"  (*Id.* at ¶ 12.)  Daniel,

21   Hutchins, and Zalec ignored that Carlos Williams told them twice he was a resident.  (*Id.* at ¶ 13.)

22   Plaintiff and his brother showed their hands to Daniel, Hutchins, and Zalec within one or two

23   seconds of seeing guns pointed at them and being told to "show me your fucking hands."  (*Id.* at ¶

24   14.)  The Williams brothers did not attempt to flee or run away.  (*Id.*)

25          One of the deputies said, "turn around."  (*Id.* at ¶ 32.)  Approximately two seconds after

26   one of the deputies said "turn around," Hutchins struck Plaintiff in the back of his head with what

27   is to believed to be Hutchins's pistol.  (*Id.* at ¶ 43.)  After Hutchins struck him in the head, Daniel

28   wrapped his arm around Plaintiff's neck and dragged him to the ground while he remained in a

4

chokehold.  (*Id.* at ¶ 45.)  Daniel dragged Plaintiff to the ground with Daniel's back on the pavement, and Plaintiff's back to Daniel's chest while Daniel held him in a chokehold.  (*Id.* at ¶ 46.)  While Daniel held Plaintiff in a chokehold, Zalec repeatedly struck Plaintiff with his flashlight and kicked Plaintiff.  (*Id.* at ¶ 48.)  While on the ground, Daniel released his chokehold on Plaintiff and then elbowed him in the face at least five times.  (*Id.* at ¶ 49.)  Meanwhile, Hutchins conducted a "leg sweep" of Carlos Williams and brought him to the ground.  (*Id.* at ¶ 50.)  Hutchins then got on top of Carlos Williams and placed all of his bodyweight on Carlos Williams's head, pushing his head into the pavement and repeatedly jerking and smashing Carlos Williams's head into the pavement.  (*Id.*)  While being held down by Hutchins, Carlos Williams began screaming at the top of his lungs "What did he do?" and "Why are you hitting him?"  (*Id.* at ¶ 51.)  Zalec responded to Carlos Williams by telling him repeatedly "shut up," "shut the fuck up," and "be quiet."  (*Id.* at ¶ 52.)  Carlos Williams's screams alerted neighbors such as Donna Abayon.  (*Id.* at ¶¶ 53–54.)  Daniel, Hutchins, and Zalec arrested Plaintiff at 10:39 p.m. and read him his *Miranda* rights at approximately 11:05 p.m., once he was inside a police car.  (*Id.* at ¶ 56.)  Daniel, Hutchins, and Zalec arrested Carlos Williams at 10:30 p.m. and read him his *Miranda* rights the next day at approximately 2:09 a.m. when Zalec booked him at Sacramento County jail.  (*Id.* at ¶ 57.)  Daniel, Hutchins, and Zalec arrested Plaintiff and his brother for resisting arrest, in violation of California Penal Code § 148(a).  (*Id.* at ¶ 59; ECF No. 72-3 at 15.)

### D.   Procedural History

Plaintiff alleges he remained in the Sacramento County Jail for approximately fourteen to fifteen hours before he was released on bail.  (ECF No. 1 ¶ 34.)  On May 7, 2019, the Sacramento District Attorney's Office dropped the criminal charges against Plaintiff.  (*Id*. at ¶ 36.)

On March 18, 2020, Plaintiff initiated this action against the County and City Defendants, alleging the following eight causes of action: (1) a 42 U.S.C. § 1983 ("§ 1983") claim for excessive force in violation of the Fourth Amendment; (2) a § 1983 claim for unlawful detention and false arrest in violation of the Fourth Amendment; (3) assault and battery; (4) false arrest/false imprisonment; (5) negligence; (6) violation of the California Tom Bane Civil Rights Act ("Bane Act"); (7) intrusion into private affairs; and (8) intentional infliction of emotional

distress ("IIED").  (*See* ECF No. 1.)  Plaintiff also alleges *Monell* liability claims under § 1983

against all Defendants.  (*Id.* at 9, 11.)   On December 7, 2023, City Defendants filed the instant

motion for partial motion summary judgment.  (ECF No. 64.)

## II.   STANDARD OF LAW

Summary judgment is appropriate when the moving party demonstrates no genuine issue

of any material fact exists and the moving party is entitled to judgment as a matter of law.  Fed.

R. Civ. P. 56(a)*; Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  Under summary

judgment practice, the moving party always bears the initial responsibility of informing the

district court of the basis of its motion, and identifying those portions of "the pleadings,

depositions, answers to interrogatories, and admissions on file together with affidavits, if any,"

which it believes demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v.

Catrett*, 477 U.S. 317, 323 (1986).  "[W]here the nonmoving party will bear the burden of proof

at trial on a dispositive issue, a summary judgment motion may properly be made in reliance

solely on the pleadings, depositions, answers to interrogatories, and admissions on file."  *Id*. at

324 (internal quotation marks omitted).  Indeed, summary judgment should be entered against a

party who does not make a showing sufficient to establish the existence of an element essential to

that party's case, and on which that party will bear the burden of proof at trial.

If the moving party meets its initial responsibility, the burden then shifts to the opposing

party to establish that a genuine issue as to any material fact does exist.  *Matsushita Elec. Indus.

Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986); *First Nat'l Bank of Ariz. v. Cities Serv.

Co.*, 391 U.S. 253, 288–89 (1968).  In attempting to establish the existence of this factual dispute,

the opposing party may not rely upon the denials of its pleadings but is required to tender

evidence of specific facts in the form of affidavits, and/or admissible discovery material, in

support of its contention that the dispute exists.  Fed. R. Civ. P. 56(c).  The opposing party must

demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the

suit under the governing law, *Anderson v. Defendant Lobby, Inc.*, 477 U.S. 242, 248 (1986), and

that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict

for the nonmoving party.  *Id*. at 251–52.

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *First Nat'l Bank of Ariz.*, 391 U.S. at 288–89. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (quoting Rule 56(e) advisory committee's note on 1963 amendments).

In resolving the motion, the Court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with any applicable affidavits. Fed. R. Civ. P. 56(c); *SEC v. Seaboard Corp.*, 677 F.2d 1301, 1305–06 (9th Cir. 1982). The opposing party's evidence is to be believed and all reasonable inferences that may be drawn from the facts pleaded before the court must be drawn in favor of the opposing party. *Anderson*, 477 U.S. at 255. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898 (9th Cir. 1987). Finally, to demonstrate a genuine issue that necessitates a jury trial, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id*. at 587.

### III.   ANALYSIS[8]

City Defendants move for partial summary judgment on the following claims: (1) unlawful detention and false arrest (Claims Two and Four); (2) *Monell* municipal liability (Claims One and Two); (3) negligence (Claim Five); (4) intrusion into private affairs (Claim Seven); and (5) Bane Act (Claim Six). (*See* ECF No. 64-1.) The Court will consider the claims in turn, after

---

[8]   In several locations in his opposition, Plaintiff redacts certain information, presumably under the parties' stipulated protective order. (*See* ECF No. 22.) In the instant matter, the redacted information was unnecessary to resolve the instant motion. However, counsel for Plaintiff is advised that should they want to file briefing with redactions with the Court in the future, counsel must seek a request to seal. After the Court grants the request to seal, counsel can file a public version with redactions and file an unredacted version under seal.

1　addressing the video evidence submitted by Plaintiff and City Defendants.

2　　　　　　　　　　A.　　Video Evidence

3　　　　City Defendants and Plaintiff submitted video evidence.  (ECF No. 64-4 at 20–21

4　("Exhibit E"); ECF No. 69-3 at 233 ("Exhibit 19").)  Both exhibits have been lodged with the

5　Court.  The Supreme Court has stated that, when ruling on motions for summary judgment, courts

6　"should [] view [] the facts in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372,

7　380–81 (2007).  However, "[t]he mere existence of video footage of the incident does not

8　foreclose a genuine factual dispute as to the reasonable inferences that can be drawn from that

9　footage," and "[t]he record is viewed in the light most favorable to the nonmovants[.]" *Vos v.*

10　*City of Newport Beach*, 892 F.3d 1024, 1028 (9th Cir. 2018) (citing *Scott*, 550 U.S. at 380

11　(focusing on whether a party's version of events "is so utterly discredited by the record that no

12　reasonable jury could have believed him")).  Accordingly, the Court will consider the video

13　footage but draw all reasonable inferences in Plaintiff's favor.

14　　　　　　　　　　B.　　Unlawful Detention and False Arrest in Violation of the Fourth

15　　　　　　　　　　　　　Amendment (Claim Two)

16　　　　　　　　　　　　　*i.*　　*Fourth Amendment Unlawful Detention*

17　　　　"The Fourth Amendment prohibits 'unreasonable searches and seizures' by the

18　Government, and its protections extend to brief investigatory stops of persons or vehicles that fall

19　short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citing *Terry v.*

20　*Ohio*, 392 U.S. 1, 9 (1968)).  Police officers may conduct a brief, investigatory search or seizure,

21　so long as they have a reasonable, articulable suspicion that "criminal activity may be afoot" or

22　the person is a suspect in a completed crime, even if they lack probable cause under the Fourth

23　Amendment.  *Terry*, 392 U.S. at 30; *United States v. Hensley*, 469 U.S. 221, 227–29 (1985)

24　("[W]here police have been unable to locate a person suspected of involvement in a past crime,

25　the ability to briefly stop that person, ask questions, or check identification in the absence of

26　probable cause promotes the strong government interest in solving crimes and bringing offenders

27　to justice."); *Guam v. Ichiyasu*, 838 F.2d 353, 355 (9th Cir. 1988) (noting that under *Terry*,

28　"police officers may make a brief, investigatory stop of an individual upon less than probable

1  cause if, under the totality of the circumstances, they can point to articulable facts which support

2  a reasonable suspicion that the person stopped is engaging or about to engage in a crime").

3        City Defendants argue "Burnett's call to the Sacramento County Sheriff's Office exhibited

4  sufficient indicia of reliability" to provide the deputies with "reasonable suspicion to detain

5  Plaintiff." (ECF No. 64-1 at 10.)  City Defendants note the deputies, upon arriving on scene,

6  were able to corroborate much of the information Burnett provided.  (*Id.* at 11.)  City Defendants

7  further argue, based on the totality of the circumstances, "[t]he specific and articulated facts

8  relayed to the [d]eputies through dispatch and observed by them at the scene, together with the

9  rational inferences from those facts, reasonably suggested criminal activity that warranted a

10  detention and further investigation."  (*Id.*)  In opposition, Plaintiff asserts that City Defendants

11  violated his Fourth Amendment rights by unlawfully detaining him without reasonable suspicion.

12  (ECF No. 69 at 14.)  Plaintiff contends the deputies' behavior in conducting the stop was

13  "objectively unreasonable," as the deputies immediately resorted to potentially deadly force in

14  attempting to detain him and never identified themselves as police.  (*Id.* at 15.)

15        The Court notes, as an initial matter, that Plaintiff spends most of his briefing on this

16  claim discussing whether the manner of detention was reasonable.  Defendants are correct that the

17  relevant question is *whether the deputies' decision to effectuate the stop itself was lawful*.  (ECF

18  No. 72 at 2.)  The crux of the parties' disagreement is whether Burnett's non-anonymous 911

19  phone call was sufficient to establish reasonable suspicion to stop Plaintiff and his brother, and

20  the parties debate the applicability of *United States v. Terry-Crespo*, 356 F.3d 1170 (9th Cir.

21  2014) to the instant matter.  Plaintiff contends City Defendants' reliance on *Terry-Crespo* for the

22  proposition that Burnett's non-anonymous 911 phone call alone was sufficient to establish

23  reasonable suspicion is wrong.  (ECF No. 69 at 16.)  Plaintiff argues this ignores the requisite

24  "totality of the circumstances" analysis and does not obviate a police officer's duty to investigate

25  and collect information to determine whether there is evidence of a crime in progress.  (*Id.* at 16–

26  17.)  Plaintiff notes there were no corroborating circumstances to support Burnett's 911 phone

27  call and the police arrested the brothers without giving any consideration to questions such as the

28  possibility the brothers could have been neighborhood residents.  (*Id.* at 16–17.)  City Defendants

are ultimately correct that Plaintiff does not cite to any legal authority to support these assertions, which are about whether the manner of the detention was reasonable, not the legality of the deputies' decision to effectuate a detention.  (ECF No. 72 at 2.)  The latter is the question at issue in this claim.

In *Terry-Crespo*, the Ninth Circuit held that an emergency 911 call, standing alone, exhibited sufficient "indicia of reliability" *prior* to the *Terry* stop to provide the officer with reasonable suspicion justifying the stop.  356 F.3d at 1173–77.  The Ninth Circuit provided four reasons.  First, it noted that the initial 911 call, made by Jose Domingis ("Domingis"), "was not anonymous and therefore was entitled to greater reliability," and the Portland police even recorded both of Domingis's 911 calls and provided the court with a recording and transcription. *Id.* at 1174–75.  Second, the court stated that Domingis's 911 call was "entitled to greater reliability than a tip concerning general criminality because the police must take 911 emergency calls seriously and respond with dispatch," and 911 calls "involve exigent situations that may limit the police's ability to gather identifying information."  *Id.* at 1176.  Third, the fact that Domingis "risked any anonymity he might have enjoyed and exposed himself to legal sanction further supports the tip's reliability."  *Id.*  Fourth, the court concluded the police could find Domingis's tip more reliable because "his call evidenced first-hand information from a crime victim laboring under the stress of recent excitement," noting that the same logic behind the "excited utterance" hearsay exception is applicable here — "such statements are reliable because it is unlikely that the statements were contrived or the product of reflection."  *Id.* at 1177.

The Court finds that the logic behind *Terry-Crespo* is applicable in the instant matter and Burnett's call to 911 largely meets the same four factors outlined by the Ninth Circuit.  First, Burnett's call was not anonymous.  As City Defendants note, Burnett identified himself by name, gave the dispatcher his phone number, and called the Sheriff's Office emergency line, which was recorded.  (ECF No. 64-1 at 10.)  Second, the principle articulated by the Ninth Circuit that 911 calls are entitled to greater reliability than a tip involving general criminality is present here as well, as 911 calls "involve exigent situations that may limit the police's ability to gather identifying information."  *Terry-Crespo*, 356 F.3d at 1176. Third, like Domingis, Burnett risked

10

anonymity and exposed himself to legal sanction, as it is also a crime in California to provide a false report to the police. *See* Cal. Pen. Code § 148.5 ("Every person who reports to any peace officer . . . that a felony or misdemeanor has been committed, knowing the report to be false, is guilty of a misdemeanor.").  Fourth, while Burnett was not a crime victim, his tip was made immediately after interacting with Plaintiff and his brother, making it "unlikely that the statements were contrived or the product of reflection."  *See Terry-Crespo*, 356 F.3d at 1177. City Defendants also correctly argue Plaintiff does not challenge the reliability of Burnett's phone call to the police nor does he suggest that *Terry-Crespo* has been overruled.  (ECF No. 72 at 2.)

Burnett also reported additional facts about what he witnessed to the 911 emergency line. Burnett reported seeing two unknown subjects enter the Subject Residence through the side door of the garage, and the subjects were using flashlights and played with the lock for a while before the door opened.  (ECF No. 1 ¶ 8.)  When Burnett confronted the subjects, they initially stated they lived at the address, but then told Burnett they did not live at the address and became verbally aggressive.  (*Id.*)  The subjects then told Burnett to "mind his business" and called him various names.  (*Id.*)  The subjects drove a grey Dodge van and appeared to be in a hurry.  (*Id.*) Dispatch also provided deputies an update, letting them know that one subject was identified as a Black male adult and wearing a white jacket and both subjects were out of the Subject Residence and walking toward Burnett's home on Evanston way.  (*Id.* at ¶ 9.)  The deputies were then able to corroborate some of the information dispatch provided to them upon their arrival at the scene. After they arrived, the deputies saw the subjects were standing in the street on Evanston Way, and one of the subjects was wearing a grey or white colored jacket closely resembling the clothing described in the report to the police.  (*Id.* at ¶ 17.)  Accordingly, the Court finds that, based on the totality of the circumstances, there were sufficient articulable facts to establish reasonable suspicion.  *See Terry*, 392 U.S. at 30.

Based on the foregoing, Burnett's non-anonymous 911 phone call was sufficient to establish reasonable suspicion to stop Plaintiff and his brother.  Accordingly, City Defendants' motion for summary judgment as to the unlawful detention aspect of Claim Two is GRANTED.

1          *ii.        Fourth Amendment False Arrest*

2          "Under the Fourth Amendment, a warrantless arrest requires probable cause." *United*

3    *States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007) (citing *Michigan v. Summers*, 452 U.S. 692,

4    700 (1981)).  Police officers are immune from suit if probable cause existed for an arrest.  *Beck v.*

5    *Ohio*, 379 U.S. 89, 91 (1964).  Probable cause is satisfied when, at the moment of the seizure, the

6    facts and circumstances within the officers' knowledge and of which they have reasonably

7    trustworthy information are sufficient to warrant a prudent person to believe that the suspect had

8    committed or was committing an offense.  *Beck*, 379 U.S. at 91.  Alternatively, the Ninth Circuit

9    has defined probable cause as when "under the totality of circumstances known to arresting

10   officers, a prudent person would have concluded that there was fair probability that [the

11   defendant] had committed a crime." *Lopez*, 482 F.3d at 1072.  While conclusive evidence of guilt

12   is not necessary under this standard to establish probable cause, "[m]ere suspicion, common

13   rumor, or even strong reason to suspect are not enough." *McKenzie v. Lamb*, 738 F.2d 1005,

14   1008 (9th Cir. 1984) (citing *Henry v. United States*, 361 U.S. 98, 101, (1959)).  "Probable cause is

15   lacking if the circumstances relied on are susceptible to a variety of credible interpretations not

16   necessarily compatible with nefarious activities." *Gasho v. United States*, 39 F.3d 1420, 1432

17   (9th Cir. 1994) (citations omitted).  In the instant matter, the parties do not dispute that an arrest

18   occurred but rather whether there was sufficient probable cause to effectuate the arrest.

19          City Defendants argue the deputies had probable cause to believe Plaintiff violated Penal

20   Code § 148(a)(1) when he refused to comply with lawful police directives, as Daniel commanded

21   Plaintiff to stop but the video footage "clearly shows that Plaintiff immediately began raising his

22   voice and yelling at [d]eputies" and "continued to advance at deputies despite being instructed to

23   stop." (ECF No. 64-1 at 13.)  City Defendants note the following: Daniel drew his firearm and

24   pointed it at Plaintiff to gain compliance; Zalec, who also had his firearm drawn, commanded

25   Plaintiff no less than three times to turn around; Plaintiff refused to turn around and continued

26   yelling and arguing with the deputies; and Plaintiff "willfully resisted, delayed, and obstructed the

27   deputies in their attempts to investigate the burglary call." (*Id.*)  City Defendants contend

28   Plaintiff knew or should have known the deputies were peace officers and engaged in the lawful

performance of their duties as they were in full police uniforms, had firearms drawn, and Plaintiff admits he knew neighbors had called the police.  (*Id.*)

In opposition, Plaintiff asserts City Defendants' arguments are directly contradicted by the audio-video footage recorded by Zalec's in-car camera system and City Defendants "can point to no instance in the sixteen (16) seconds between 'show me your fucking hands' and [deputies] physically attacking [Plaintiff and his brother] where a lawful police command was disobeyed." (ECF No. 69 at 18 (citing Exhibit 19).)  Plaintiff argues that, in response to the deputies' command to "turn around," he and his brother did not respond with any "affirmative act to disobey or resist an officer" pursuant to Penal Code § 148(a)(1), and therefore summary judgment is not appropriate because Plaintiff materially disputes this fact.  (*Id.*)  Plaintiff also notes that even if he and his brother responded with cursing, yelling, and refusal as City Defendants contend, this would still be insufficient to assert probable cause.  (*Id.*)

In reply, City Defendants maintain the video footage corroborates their version of events as it relates to Zalec's commands to Plaintiff to "turn around" at minute markers 05:13, 05:15, and 05:20, as it was only after the third command that the deputies moved to detain Plaintiff and had probable cause to arrest him for violation of Penal Code § 148(a)(1).  (ECF No. 72 at 3.)  City Defendants also maintain that Plaintiff cannot dispute that Daniel told him to "stop" because even though he now maintains in his opposition that the deputies did not tell him to stop moving, he stated in his deposition testimony "I don't recall," when asked whether the officers gave him any orders or commands.  (*Id.*)  City Defendants also state Daniel's order to "stop" is captured on video.  (*Id.* at 4.)

Penal Code § 148(a) has three elements: "(1) the defendant willfully resisted, delayed, or obstructed a peace officer[;] (2) when the officer was engaged in the performance of his or her duties[;] and (3) the defendant knew or reasonably should have known that the other person was a peace officer engaged in the performance of his or her duties." *Lemos v. County of Sonoma*, 40 F.4th 1002, 1006 (9th Cir. 2022) (citing *Yount v. City of Sacramento*, 43 Cal.4th 885 (2008)). "The offense is a general intent crime, proscribing only the particular act (resist, delay, obstruct) without reference to an intent to do a further act or achieve a future consequence." *In re*

*Muhammed C.*, 95 Cal. App. 4th 1325, 1329 (2002).  Section 148 is often applied to physical acts, such as physical resistance, hiding, or running away from a police officer.  *Id.* (citing *People v. Allen*, 109 Cal. App. 3d 981, 986–87 (1980)).  However, § 148 "is not limited to nonverbal conduct involving flight or forcible interference with an officer's activities," as "[n]o decision has interpreted the statute to apply only to physical acts, and the statutory language does not suggest such a limitation."  *People v. Quiroga*, 16 Cal. App. 4th 961, 968 (1993).

Here, from the video footage, Daniel, Hutchins, and Zalec can be seen approaching the Subject Residence's driveway with guns drawn and Plaintiff can be heard saying, "You got a gun on me in front of my house?" and "I didn't do anything."  (Exhibit E at 5:05–5:10.)  During this time, a deputy asks Plaintiff to "take your hands out of your pocket," to which Plaintiff initially responds by outstretching both his hands and arms.  (*Id.* at 5:07–5:09.)  The video footage also shows deputies telling Plaintiff to "turn around," but the deputies appear to be giving Plaintiff the command to "turn around" as they are approaching him to place handcuffs on him.  (*Id.* at 5:12–5:19.)

The parties largely seem to dispute the first element of Penal Code § 148(a)(1) — whether Plaintiff "willfully resisted, delayed, or obstructed" the deputies' orders.  *See Lemos*, 40 F.4th at 1006.  Considering what can be seen in the video footage, the Court is not convinced that Plaintiff's actions amount to a willful resistance, delay, or obstruction of the deputies' orders.  While City Defendants argue Plaintiff raised his voice and ignored the deputies' commands to "turn around," Ninth Circuit case law is clear that "[e]ven when crass and articulate, verbal challenges to the police are protected."  *Mackinney v. Nielsen*, 69 F.3d 1002, 1007 (9th Cir. 1995); *see also Johnson v. Bay Area Rapid Transit Dist.*, 724 F.3d 1159, 1174 (9th Cir. 2013) ("[E]ven though the police may dislike being the object of abusive language, section 148 does not allow them to use the awesome power which they possess to punish individuals for conduct that is not only lawful, but which is protected by the First Amendment.") (internal quotation marks omitted)).  Further, courts have found that, in the context of § 148, "the fact that someone verbally challenges a police officer's authority or is slow to comply with orders does not mean that he or she has delayed an investigation."  *In re Chase C.*, 243 Cal. App. 4th 107, 118 (2015).

14

Indeed, the video footage shows Zalec give Plaintiff his first command to turn around at minute marker 5:12 and by minute marker 5:19, Zalec can be seen moving toward Plaintiff to detain him. (Exhibit E at 5:12–5:19.)

Viewing the record "in the light most favorable" to Plaintiff, the Court finds there is a genuine dispute of material fact as to whether Plaintiff "willfully resisted, delayed, or obstructed" the deputies' orders in violation of Penal Code § 148(a)(1). *See Vos*, 892 F.3d at 1028; Cal. Pen. Code § 148(a)(1). Therefore, there is a genuine dispute of material fact as to whether deputies had probable cause to arrest Plaintiff and there is a genuine dispute as to whether "the facts and circumstances within the officers' knowledge and of which they have reasonably trustworthy information are sufficient to warrant a prudent person to believe that the suspect had committed or was committing an offense." *Beck*, 379 U.S. at 91. Accordingly, City Defendants' motion for summary judgment as to the false arrest aspect of Claim Two is DENIED.

### iii.     *Qualified Immunity (Claim Two)*

City Defendants argue in the alternative that they are entitled to qualified immunity for Plaintiff's Fourth Amendment unlawful detention and arrest claims because "reasonable officers in [City] Defendants' position would have believed that detaining the two subjects identified in the call as the possible burglars for purposes of investigating whether a burglary had occurred was not unlawful." (ECF No. 64-1 at 15.) City Defendants also argue that based on Plaintiff's "outright refusal" to comply with lawful police directives, reasonable officers would have believed arresting him for violating Penal Code § 148(a)(1) was lawful. (*Id.*) City Defendants finally note that the undisputed material facts demonstrate the deputies' conduct "in detaining and arresting Plaintiff did not violate any clearly established right . . . [n]or is there any authority standing for the proposition that arresting an individual for violation of Penal Code § 148(a)(1) when the individual willfully disobeys lawful commands was unconstitutional." (*Id.*)

In opposition, Plaintiff argues City Defendants violated three clearly established rights — use of deadly force against a non-threatening suspect, tackling and application of body weight to calm a non-dangerous suspect, and pulling a firearm on a calm and non-threatening suspect. (ECF No. 69 at 19–21.)

15

1       Qualified immunity shields officials from civil liability where a reasonable officer would

2  not have known that his conduct violated a clearly established right.  *Anderson v. Creighton*, 483

3  U.S. 635, 638–39, 641 (1987).  " Qualified immunity balances two important interests — the

4  need to hold public officials accountable when they exercise power irresponsibly and the need to

5  shield officials from harassment, distraction, and liability when they perform their duties

6  reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  However, qualified immunity

7  "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those

8  who knowingly violate the law."  *Hunter v. Bryant*, 502 U.S. 224, 229 (1991).  Thus, an "obvious

9  consequence of qualified immunity . . . is a perpetuation of racial inequality," as Black Americans

10  are more likely to be pulled over, searched, arrested, imprisoned, wrongfully convicted, and killed

11  by law enforcement officers.  *Green v. Thomas*, No. 3:23-CV-126-CWR-ASH, 2024 WL

12  2269133, at *8 (S.D. Miss. May 20, 2024) (citing various academic articles and national

13  databases).

14       Specifically, a court can only deny a law enforcement officer qualified immunity at

15  summary judgment in a § 1983 suit if: (1) the facts alleged, viewed most favorably to the

16  plaintiff, show the officer violated the plaintiff's constitutional rights; and (2) the right was

17  clearly established so a reasonable officer would have known his conduct to be unlawful.

18  *Longoria v. Pinal Cnty.*, 873 F.3d 699, 704 (9th Cir. 2017) (citation omitted).  The second step of

19  the qualified immunity analysis "requires two separate determinations: (1) whether the law

20  governing the conduct at issue was clearly established and (2) whether the facts as alleged could

21  support a reasonable belief that the conduct in question conformed to the established law."  *Green*

22  *v. City & Cnty. of San Francisco*, 751 F.3d 1039, 1052 (9th Cir. 2014) ("*Green*").  "Both are

23  questions of law to be determined by the court in the absence of genuine issues of material fact."

24  *Id*.

25       In other words, even if the evidence shows Daniel, Hutchins and Zalec violated the Fourth

26  Amendment, a "reasonable but mistaken belief that [their] conduct was lawful would result in the

27  grant of qualified immunity."  *Wilkins v. City of Oakland*, 350 F.3d 949, 955 (9th Cir.2003).

28  Because the Court finds there is a genuine dispute of material fact as to whether City Defendants

1    violated Plaintiff's Fourth Amendment rights with respect to the false arrest claim, the Court

2    proceeds to the second step of the qualified immunity analysis.  With respect to "whether the law

3    governing the conduct at issue was clearly established," the Court finds this is settled as a matter

4    of law.  It was well-established at the time of Plaintiff's arrest that "individuals may not be

5    subjected to seizure or arrest without reasonable suspicion or probable cause, especially when the

6    stop includes detention and interrogation at gunpoint, and that highly intrusive measures may not

7    be used absent extraordinary circumstances." *Green*, 751 F.3d at 1052 (citing *Washington v.

8    Lambert*, 98 F.3d 1181, 1192–93).)  Moreover, with respect to Plaintiff's Fourth Amendment

9    false arrest claim, Ninth Circuit precedent has made clear that "[a]n individual's temporary

10   refusal to comply with an officer's commands is not in itself a valid basis for an arrest . . . Nor is

11   an individual's peaceful, verbal challenge to police action a valid basis." *Sialoi v. City of San

12   Diego*, 823 F.3d 1223, 1234 (9th Cir. 2016) (citing *Mackinney v. Nielsen*, 69 F.3d 1002, 1005–06

13   (9th Cir. 1995)).  "It is well established under California law that even an outright refusal to

14   cooperate with police officers cannot create adequate grounds for [police] intrusion without

15   more." *Mackinney*, 69 F.3d at 1006 (internal quotations and citation omitted).  Thus, applying

16   Ninth Circuit precedent and construing the facts in the light most favorable to Plaintiff, the Court

17   finds Plaintiff's right against such intrusive measures was established at the time of his detention

18   and Plaintiff's right to verbally challenge and temporarily refuse to comply with the deputies'

19   commands was established at the time of his arrest.

20          With respect to "whether the facts as alleged could support a reasonable belief that the

21   conduct in question conformed to the established law," the Court finds the existence of a genuine

22   dispute of material fact precludes it from answering this question as a matter of law.  Specifically,

23   there are genuine disputes of material fact as to whether Daniel, Hutchins, and Zalec could have

24   reasonably believed Plaintiff's arrest was lawful.  The parties dispute whether Plaintiff was

25   uncooperative in complying with the deputies' commands at gunpoint and whether Plaintiff's

26   verbal protestations and delays amount to willfully resisting, delaying, or obstructing the deputies

27   in their attempts to investigate the burglary call.  Because these factual disputes must be resolved

28   by a jury, the Court cannot determine as a matter of law whether Daniel, Hutchins, and Zalec

17

1   reasonably believed their actions were lawful.  *See Johnson*, 724 F.3d at 1180 (refusing to grant

2   qualified immunity at summary judgment where question of whether the officer acted reasonably

3   could not be determined based on facts before the court and finding this question must be

4   resolved by a jury).  Accordingly, City Defendants' motion for summary judgment as to Claim

5   Two on the basis of qualified immunity is DENIED.

6   　　　　　　　　　　　C.　　*Monell* Municipal Liability (Claims One and Two)

7   　　　　City Defendants argue the City of Rancho Cordova is entitled to summary judgment on

8   Plaintiff's municipal liability claim under *Monell v. New York City Dep't of Social Services*, 436

9   U.S. 658 (1978) because Plaintiff does not identify a policy that amounted to deliberate

10   indifference or that was the moving force behind the alleged constitutional violation.  (ECF No.

11   64-1 at 16–18.)  City Defendants note that instead, Plaintiff "simply contends" the City of Rancho

12   Cordova is liable because it "maintained customs, policies, or practices that allowed and/or

13   caused the underlying constitutional violations."  (*Id.* at 16–17.)  City Defendants assert that, "to

14   the extent Plaintiff attempts to establish an unlawful policy in the form of custom or practice, his

15   allegations are insufficient to make this showing."  (*Id.* at 17.)  In opposition, Plaintiff contends

16   he has "discovered substantial evidence of a ratification theory of *Monell* liability" and "has

17   raised triable issues of material fact as to whether an official with final policy-making authority

18   ratified Daniel, Zalec, and Hutchins'[s] unconstitutional use of excessive force."  (ECF No. 69 at

19   27.)  City Defendants note in reply that Plaintiff raises a ratification theory for the first time in his

20   opposition and does not address their arguments.  (ECF No. 72 at 5.)

21   　　　　Under Ninth Circuit precedent, a plaintiff may recover under *Monell* based on one of three

22   theories of liability.  *Clouthier v. Cnty. of Contra Costa*, 591 F.3d 1232, 1249–50 (9th Cir. 2010),

23   *overruled on other grounds by Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1070 (9th Cir.

24   2016).  First, "a local government may be held liable 'when implementation of its official policies

25   or established customs inflicts the constitutional injury.'"  *Id.* at 1249 (quoting *Monell*, 436 U.S.

26   at 708).  Second, "under certain circumstances, a local government may be held liable under §

27   1983 for acts of omission, when such omissions amount to the local government's own official

28   policy."  *Id.* (internal quotation marks omitted).  Third, "a local government may be held liable

1    under § 1983 when the individual who committed the constitutional tort was an official with final

2    policy-making authority or such an official ratified a subordinate's unconstitutional decision or

3    action and the basis for it."  *Id*. at 1250 (internal quotation marks omitted).

4      Here, with respect to Plaintiff's previously pleaded custom and practice theory of *Monell*

5    liability, Plaintiff does not address the merits of this theory in his opposition and therefore the

6    Court considers it abandoned.  *See Jenkins v. Cnty. of Riverside*, 398 F.3d 1093, 1095 n.4 (9th

7    Cir. 2005) (party abandoned claim by not raising it in their opposition).

8      With respect to Plaintiff's ratification theory of *Monell* liability, Plaintiff "may not

9    effectively amend [his] Complaint by raising a new theory . . . in [his] response to a motion for

10   summary judgment."  *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624

11   F.3d 1083, 1089 (9th Cir. 2010).  The Court finds Plaintiff's ratification theory a new theory of

12   liability because, after carefully reviewing the Complaint, Plaintiff did not make any allegations

13   regarding a ratification theory or including any allegations against an official with final policy-

14   making authority.  (*See* ECF No. 1.)  Moreover, there is no indication from Plaintiff's arguments

15   that he made known to City Defendants that he was pursuing a ratification theory of liability at

16   any time prior to the summary judgment stage.  As the Ninth Circuit explained in *Coleman v.

17   Quaker Oats Co*., 232 F.3d 1271, 1292 (9th Cir. 2000), to allow Plaintiff to proceed with a

18   previous unpleaded legal theory after the close of discovery would prejudice City Defendants

19   who would not be "on notice of the evidence it needs to adduce in order to defend

20   against . . . [P]laintiff's allegations."  "Simply put, summary judgment is not a procedural second

21   chance to flesh out inadequate pleadings."  *Wasco Products, Inc. v. Southwall Techs., Inc.*, 435

22   F.3d 989, 992 (9th Cir. 2006) (internal citation omitted); *Caldwell v. City of San Francisco*, No.

23   12-cv-01892-DMR, 2020 WL 7643124 (N.D. Cal. Dec. 23, 2020) (rejecting *Monell* claim based

24   on previously unpleaded custom and practice theories).  Because City Defendants did not have

25   notice that Plaintiff would pursue a ratification theory of liability at the summary judgment stage,

26   the Court finds Plaintiff may not proceed on his ratification theory of liability at this juncture.

27     Because Plaintiff may not proceed on a ratification theory and he has abandoned his

28   custom and practice theory, the Court finds Plaintiff's *Monell* claim against the City of Rancho

Cordova fails as a matter of law.  Accordingly, City Defendants' motion for summary judgment as to Plaintiff's *Monell* claims (Claims One and Two) against the City of Rancho Cordova is GRANTED.

### D.  False Arrest (Claim Four)

City Defendants move for summary judgment on Plaintiff's state law false arrest claim, making identical (overlapping) arguments regarding the Fourth Amendment false arrest claim and the state law false arrest claim.  (ECF No. 64-1 at 11–12.)

A false imprisonment claim in an arrest context arises upon "(1) the nonconsensual, intentional confinement of a person, (2) without lawful privilege, and (3) for an appreciable period of time, however brief." *Easton v. Sutter Coast Hosp.*, 80 Cal. App. 4th 485, 496 (2000). In the arrest context, an officer acts "without lawful privilege" either when he arrests without probable cause. *Blaxland v. Commonwealth Dir. of Pub. Prosecutions*, 323 F.3d 1198, 1205 n.4 (9th Cir. 2003) (citing *Jackson v. City of San Diego*, 121 Cal. App. 3d 579, 585 (1981)).

Here, as established above, there is a genuine dispute of material fact as to whether deputies had probable cause to arrest Plaintiff.  Therefore, there is a genuine dispute of material fact as to whether the deputies acted with lawful privilege to arrest Plaintiff.  Accordingly, City Defendants' motion for summary judgment as to Claim Four is DENIED.

### E.  Negligence (Claim Five)

City Defendants move for summary judgment as to Plaintiff's negligence claim against the City of Rancho Cordova for negligent hiring, training, retention, and assignment, arguing Plaintiff's claim is barred by California law because City Defendants did not owe Plaintiff a statutorily imposed duty of care.[9]  (ECF No. 64-1 at 18–19 (citing *Vargas v. Cnty. of San Bernardino*, No. EDCV 18-946-MWF (KKx), 2018 WL 6177243, at *5 (C.D. Cal. July 30,

---

[9]  City Defendants also move for summary judgment "to the extent Plaintiff's negligence [claim] is based on his detention and arrest" because "the Deputies had reasonable suspicion to detain Plaintiff for the potential burglary and probable cause to arrest him for violating Penal Code § 148(a)(1)."  (ECF No. 64-1 at 19.)  However, as discussed above, the Court cannot say as a matter of law that Daniel, Hutchins, and Zalec had probable cause to arrest Plaintiff for a violation of Penal Code § 148.  Therefore, City Defendants' motion for summary judgment as to Plaintiff's negligence claim on the grounds of arrest is DENIED.

1   2018))).)   In opposition, Plaintiff asserts that he has raised genuine disputes of material fact

2   relating to a post-incident Internal Affairs investigation of Plaintiff and that the City of Rancho

3   Cordova owed him a mandatory duty to hold its officers (Daniel, Zalec, and Hutchins)

4   accountable for "Serious Misconduct" under California Government Code § 815.6, which states

5   that

> [w]here a public entity is under a mandatory duty imposed by an
> enactment that is designed to protect against the risk of a particular
> kind of injury, the public entity is liable for that injury of that kind
> proximately caused by its failure to discharge the duty unless the
> public entity establishes that it exercised reasonable diligence to
> discharge the duty.

10  (ECF No. 69 at 22.)  Plaintiff maintains the City was under a mandatory duty under California

11  Code of Regulations §§ 1205 and 1206[10] to hold the deputies accountable and "it remains

12  materially disputed that" the City of Rancho Cordova "failed its mandatory duty to conduct a

13  meaningful investigation" of Daniel, Zalec, and Hutchins.  (*Id.* at 23.)  In reply, City Defendants

14  note Plaintiff raises this new theory of liability for the first time in his opposition, Plaintiff is

15  unable to satisfy the criteria under § 815.6, and Plaintiff ignores the legal authority that provides

16  municipal employers cannot be held liable for negligent hiring, training, or retention.  (ECF No.

17  72 at 6.)

18          California law does not provide for a direct liability claim based on a public entity's

19  alleged negligent hiring, training, retention, and supervision practices.  *Vargas*, 2018 WL

20  6177243, at *5.  Therefore, to assert a direct liability claim against a governmental entity

21  asserting negligent hiring and supervision, such a claim must be "grounded in the breach of a

22  statutorily imposed duty owed by the entity to the injured party."  *de Villers v. Cnty. of San*

23  *Diego*, 156 Cal. App. 4th 238, 255–56 (2007).

24          Here, Plaintiff's Complaint does not provide any statutory basis for his allegation that the

25  City of Rancho Cordova is directly liable for its negligent hiring, training, retention, and

26  assignment of its employees.  (*See* ECF No. 1.)  With respect to Plaintiff's argument in his

---

27  [10]     As City Defendants correctly note, Plaintiff cites to Cal. Gov't Code §§ 1205 and 1206,
    which do not exist.  (ECF No. 72 at 6 fn.3.)  The Court construes Plaintiff's argument as referring
28  to the California Code of Regulations.

1   opposition that the City of Rancho Cordova owed him a duty to hold Daniel, Zalec, and Hutchins

2   accountable for "Serious Misconduct" under California Code of Regulations §§ 1205 and 1206,

3   Plaintiff does not cite to any authority for the proposition that either section imposes a mandatory

4   duty on municipalities like the City of Rancho Cordova.  Section 1205 defines the term "Serious

5   Misconduct" but does not contain any language that imposes a mandatory duty on any

6   government agency.  Cal. Code Regs. § 1205.  Further, while § 1206 explicitly imposes duties on

7   the Commission on Peace Officer Standards and Peace Officers Standards Accountability

8   Division for the processing of citizen complaints against peace officers, there is no such

9   mandatory language for municipalities.  *See* Cal. Code Regs. § 1206.  Plaintiff further fails to

10  establish a connection between a duty regarding the processing of citizen complaints against

11  peace officers with a duty to properly hire, train, retain, and assign peace officers.

12         Because Plaintiff has not identified a statute which imposes direct liability on the City of

13  Rancho Cordova for negligent hiring, training, retaining, and assigning employees, the Court

14  finds this claim fails as a matter of law.  Accordingly, City Defendants' motion for summary

15  judgment as to Claim Five on the grounds of negligent hiring, training, retention, and assignment

16  is GRANTED.

17                    F.      Intrusion into Private Affairs (Claim Seven)

18         City Defendants argue Plaintiff cannot establish that he had a reasonable expectation of

19  privacy in his brother's home, on his person because Daniel's pat down was constitutional, or in

20  his personal effects because to the extent a search occurred at all it was proper under the Fourth

21  Amendment.[11]  (ECF No. 64-1 at 19–21.)  In opposition, Plaintiff asserts City Defendants had no

22  reasonable suspicion to detain him for any amount of time and no probable cause to arrest him,

23  and lacking both, the deputies searched his person, his brother's garage, parts of his brother's

24  house, and his and his brother's cell phones.  (ECF No. 69 at 27.)  Plaintiff further asserts that it is

25  reasonable for him to have an expectation of privacy in his brother's home because they are

26

27  [11]     The Court notes City Defendants do not move for summary judgment on Plaintiff's
        intrusion into private affairs claim to the extent it is premised on Daniels, Hutchins, and Zalec's
28      intrusion into Plaintiff's closed and locked vehicle.

                                                    22

1   family, as he also has a reasonable expectation of privacy as to his cell phone and items on his

2   person.  (*Id.*)  In reply, City Defendants contend Plaintiff does not argue that the search of his

3   person or personal effects would be unlawful in the event his arrest is deemed lawful.  (ECF No.

4   72 at 7.)  City Defendants also note that, with respect to Plaintiff's argument about a reasonable

5   expectation of privacy in his brother's home, this argument ignores clearly legal authority and

6   being "family" with the owner of the home is insufficient.  (*Id.*)

7          A claim of intrusion into private affairs has two elements: (1) "the defendant must

8   intentionally intrude into a place, conversation, or matter as to which the plaintiff has a reasonable

9   expectation of privacy;" and (2) "the intrusion must occur in a manner highly offensive to a

10   reasonable person."  *Hernandez v. Hillsides, Inc.*, 47 Cal. 4th 272, 286 (2009).  A plaintiff's

11   "expectation of privacy must be objectively reasonable."  *Id.*  The Court will address City

12   Defendants' arguments regarding Plaintiff's expectation of privacy with regards to his brother's

13   home, his person, and his personal effects in turn.

14          With respect to the deputies' alleged intrusion into his brother's home, City Defendants

15   rely on *People v. Stewart* for the proposition that people do not generally have a legitimate

16   expectation of privacy under the Fourth Amendment in homes they do not own or possess.  113

17   Cal. App. 4th 242, 250 (2003).  However, Plaintiff's claim is based on the tort of intrusion into

18   private affairs, not his Fourth Amendment right to be free from unlawful searches and seizures.

19   (*See* ECF No. 1 at 16.)  City Defendants fail to explain why Fourth Amendment search and

20   seizure analysis is relevant to the state law tort of intrusion into private affairs and the Court is

21   unaware of any such authority.  Indeed, under California law, to show intrusion, a plaintiff must

22   have "an objectively reasonable expectation of seclusion or solitude in the place, conversation or

23   data source" and the defendant must have "penetrated some zone of physical or sensory privacy

24   surrounding, or obtained unwanted access to [information] about, the plaintiff."  *Shulman v. Grp.

25   W Prods., Inc.*, 18 Cal. 4th 200, 232 (1998), *as modified on denial of reh'g* (July 29, 1998).  City

26   Defendants have not provided any authority which states Plaintiff did not have an objectively

27   reasonable expectation of privacy in his brother's home as a matter of law.  In the absence of such

28   authority, the Court finds summary judgment on this issue would be inappropriate because the

1  question of whether Plaintiff had an objectively reasonable expectation of privacy in his brother's

2  home is a question of fact to be decided by a jury.

3       With respect to Daniel, Hutchins, and Zalec's alleged intrusion into Plaintiff's person and

4  personal effects, "[a] search incident to a lawful arrest is an exception to the general rule that

5  warrantless searches violate the Fourth Amendment." *United States v. Camou*, 773 F.3d 932, 937

6  (9th Cir. 2014). "The exception allows a police officer making a lawful arrest to conduct a search

7  of the area within the arrestee's 'immediate control,' that is, 'the area from within which [an

8  arrestee] might gain possession of a weapon or destructible evidence.'" *Id*. (citing *Chimel v.*

9  *California*, 395 U.S. 752, 763 (1969)). The Court has concluded above that there is a genuine

10  dispute of material fact as to whether the deputies had sufficient probable cause to arrest Plaintiff.

11  Further, City Defendants fail to cite any authority regarding why an exception to the general rule

12  that warrantless searches violate the Fourth Amendment is relevant to the Court's analysis of

13  whether Plaintiff can establish a claim for the tort of intrusion into private affairs. In the absence

14  of such authority, the Court finds City Defendants have otherwise failed to explain why they are

15  entitled to summary judgment on this claim as a matter of law.

16       Accordingly, City Defendants' motion for summary judgment as to Claim Seven is

17  DENIED.

18         G.   Bane Act (Claim Six)

19       City Defendants argue Plaintiff's Bane Act claim fails because "the constitutional and

20  statutory predicates on which he relies" (namely, California Penal Code §§ 149, 240, 242) cannot

21  legally support a Bane Act claim and, while he alleges the First, Fifth, and Fourteenth

22  Amendments as predicates for his claim, "nowhere in his [C]omplaint does he allege violations of

23  his rights secured under those amendments." (ECF No. 64-1 at 21–22.) In opposition, Plaintiff

24  contends he raises triable issues of material fact to support a finding that all Defendants violated

25  his rights to be free from bodily harm pursuant to California Civil Code § 43 and the Fourth

26  Amendment right to be free from excessive force. (ECF No. 69 at 25–26.) Plaintiff maintains he

27  "raises ample evidence creating triable issues as to whether" the deputies "acted with reckless

28  disregard of [his] rights." (*Id*. at 26.) In reply, City Defendants maintain they "d[o] not challenge

24

1    Plaintiff's Bane Act claim to the extent it is predicated on Civil Code § 43 or excessive force

2    under the Fourth Amendment" and therefore the claim should be dismissed in part.  (ECF No. 72

3    at 7.)

4         The Bane Act provides a civil cause of action for "[a]ny individual whose exercise or

5    enjoyment of rights secured by the Constitution or laws of the United States, or of rights secured

6    by the Constitution or laws of [California], has been interfered with, or attempted to be interfered

7    with" through actual or attempted "threats, intimidation, or coercion."  Cal. Civ. Code § 52.1(a)–

8    (c).  Under California Civil Code § 52.1 a plaintiff bringing a cause of action under the Bane Act

9    "must show (1) intentional interference or attempted interference with a state or federal

10   constitutional or legal right, and (2) the interference or attempted interference was by threats,

11   intimidation or coercion."  *Scalia v. Cnty. of Kern*, 308 F. Supp. 3d 1064, 1080 (E.D. Cal. 2018)

12   (quoting *Allen v. City of Sacramento*, 234 Cal. App. 4th 41, 67 (2015), *as modified on denial of*

13   *reh'g* (Mar. 6, 2015).).  "[T]he egregiousness required by [§] 52.1 is tested by whether the

14   circumstances indicate the arresting officer had a specific intent to violate the arrestee's right to

15   freedom from unreasonable seizure, not by whether the evidence shows something beyond the

16   coercion 'inherent' in the wrongful detention."  *Cornell v. City & Cnty. of San Francisco*, 17 Cal.

17   App. 5th 766, 801–02 (2017), *as modified* (Nov. 16, 2017).  A court may deny summary

18   judgment for a Bane Act claim when there is sufficient evidence to create a triable issue as to

19   whether the defendants subjected the plaintiff to excessive force with the specific intent to

20   interfere with his rights.  *Murchison v. Cnty. of Tehama*, 69 Cal. App. 5th 867, 897 (2021), *review*

21   *denied* (Jan. 5, 2022).

22        Here, the Court finds that Plaintiff has failed to address in his opposition whether his Bane

23   Act claims are predicated on violations of Penal Code §§ 149, 240, and 242 or his rights under the

24   First, Fifth, and Fourteenth Amendments.  The Court therefore finds Plaintiff has abandoned

25   these predicate violations with respect to his Bane Act claim.  *See Jenkins*, 398 F.3d at 1095 n.4

26   (plaintiff abandoned claim by not raising it in opposition to motion).  Further, as City Defendants

27   do not challenge Plaintiff's Bane Act claim to the extent it is predicated on violations of the

28   Fourth Amendment and California Civil Code § 43, the Court finds Defendants' motion on this

1  issue is moot and Plaintiff may proceed on these predicate violations in his Bane Act claim.

2      Accordingly, City Defendants' motion for summary judgment as to Claim Six is

3  DENIED.

4      **IV.  CONCLUSION**

5      For the reasons set forth above, the Court GRANTS in part and DENIES in part City

6  Defendants' Motion for Summary Judgment (ECF No. 64) as follows:

7          1.  The Court GRANTS City Defendants' Motion for Summary Judgment as to:

8              a.  Claims One and Two in part with respect to the *Monell* claims against

9                  the City of Rancho Cordova;

10             b.  Claim Two in part with respect to unlawful detention;

11             c.  Claim Five in part with respect to negligent hiring, training, retention,

12                 and assignment; and

13             d.  Claim Six with respect to predicate violations of California Penal Code

14                 §§ 149, 240, and 242 and the First, Fifth, and Fourteenth Amendments

15                 of the U.S. Constitution;

16         2.  The Court DENIES City Defendants' Motion for Summary Judgment as to:

17             a.  Claim Two in part with respect to false arrest;

18             b.  Claim Four;

19             c.  Claim Five in part with respect to negligence in the false arrest;

20             d.  Claim Six with respect to the Fourth Amendment of the U.S.

21                 Constitution and California Civil Code § 43; and

22             e.  Claim Seven.

23     Plaintiff and City Defendants are ORDERED to file a Joint Status Report within thirty

24 (30) days of the electronic filing date of this Order indicating their readiness to proceed to trial on

25 the remaining claims (Claim One against Deputies Daniels, Hutchins, and Zalec only, Claim Two

26 against Deputies Daniels, Hutchins, and Zalec only, Claim Three, Claim Four, Claim Six, Claim

27 Seven, and Claim Eight).

28 //

1          IT IS SO ORDERED.

2     Date: November 8, 2024

3

4

5     _____

6     TROY L. NUNLEY
      CHIEF UNITED STATES DISTRICT JUDGE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28